Maurice J. MATHIE, Plaintiff–Appellee,

v.

Roy FRIES, in both his individual capacity and his official capacity as Sergeant of Security, Suffolk County Correctional Facilities, Defendant–Appellant.

No. 1274, Docket 96–9138.

United States Court of Appeals, Second Circuit.

Argued April 30, 1997.

Decided July 31, 1997.

Robert H. Cabble, Asst. County Atty., Hauppauge, NY (Robert J. Cimino, Suffolk County Atty., Hauppauge, NY, on the brief), for Defendant–Appellant.

Charles J. Rappaport, Melville, NY (Gregory M. Kobrick, Gandin, Schotsky & Rappaport, Melville, NY, on the brief), for Plaintiff–Appellee.

Before: MESKILL and NEWMAN, Circuit Judges, and KEENAN,* District Judge.

JON O. NEWMAN, Circuit Judge.

This appeal primarily concerns the proper amount of compensatory and punitive damages that should be awarded to a prisoner in a section 1983 suit in which the prisoner alleged that he was sexually assaulted by a prison official. Roy Fries, an officer at the Suffolk County Correctional Facility ("SCCF"), appeals from the August 8, 1996, judgment of the District Court for the Eastern District of New York (Arthur D. Spatt, Judge), awarding Maurice J. Mathie, formerly an SCCF inmate, $250,000 in compensatory damages and $500,000 in punitive damages, following a bench trial. *See Mathie v. Fries*, 935 F.Supp. 1284 (E.D.N.Y.1996). We conclude that (1) the District Judge's factual finding that Fries had sexually assaulted Mathie was not clearly erroneous, (2) the compensatory award is not excessive, and (3) the punitive award of $500,000 is excessive. We therefore remand for entry of a judgment reducing the punitive award to $200,000.

## Background

Considered in the light most favorable to the prevailing party, the evidence disclosed the following. Mathie is a homosexual. He was arrested in August 1989 for his role in the strangulation death of a man on Long Island.[1] For a year following his arrest, Mathie was held as a pretrial detainee at the SCCF. All events relevant to the present suit occurred during this period.

Fries was employed by the Suffolk County jail from 1969 until his retirement in 1995. During the period of Mathie's confinement at the SCCF, Fries was employed as the sergeant in charge of internal security at this facility. Fries's duties included arranging housing assignments for prisoners. He thus had the power to transfer inmates from one area of the facility, for instance, the protective custody section, to another if he thought a transfer was necessary. When considering transfers and other security matters, Fries interviewed inmates in either of two offices, one on the first floor and another on the second floor. The windowless second floor office could be locked from the inside so that

no one could enter it from the outside, even with a key. Fries was once married but divorced in 1971. At trial, Fries acknowledged that, by the time of the events in question, he was bisexual.

Mathie first met Fries in January 1990, when Mathie requested that he be transferred to another section of the facility because someone was threatening him. Mathie testified that during this lengthy initial meeting, which occurred in the second floor office, Fries questioned him extensively about his homosexuality and his life outside the prison—inquiring, for instance, when did Mathie discover that he was gay, whether his family knew about his sexual orientation, what type of men he liked, and whether he currently had a lover. At one point, Fries asked Mathie whether "he was feeling what I (Fries) was feeling."

Following this initial encounter, Fries met with Mathie on approximately 25 to 30 occasions over the next two months. Mathie testified that Fries gradually manifested his sexual desire for him over the course of these meetings and described the progression of Fries's conduct in vivid detail. By their fourth or fifth meeting in mid-February, for instance, Fries held Mathie's hands and rubbed his thighs. By the end of February, Fries progressed to rubbing Mathie's genitals and attempting to perform oral sex on Mathie. By the beginning of March, Fries exposed his penis to Mathie and attempted to have Mathie perform oral sex on him. As a result of these encounters, Mathie was able to describe at trial the appearance of Fries's penis in great detail. Mathie requested Fries to stop his advances, but acknowledged that Fries did not use physical force during any of these early encounters.

Mathie described in detail a final horrific episode. In mid-March 1990, Fries requested Mathie to come to the second floor office. After locking the door, Fries grabbed Mathie from behind in a bear hug, handcuffed him to two vertical pipes in a corner of the room, pulled down his own and Mathie's pants, rubbed lotion on their bodies, and anally

---

1. Mathie eventually pled guilty to manslaughter in the first degree and conspiracy in the third degree, and is currently serving consecutive sentences totaling 10 to 30 years.

penetrated Mathie. Afterwards, Fries told Mathie that he loved him and cautioned him to keep quiet about this incident. Mathie testified that he had not engaged in anal intercourse prior to Fries's assault, and that he suffered physical pain and bleeding in his anal area for the next week as a result.

A few weeks after this final encounter, Mathie informed officials at the SCCF about Fries's sexual abuse. Prison officials subsequently investigated Mathie's allegations, but no formal proceedings against Fries materialized. Fries denied all of Mathie's allegations and stated that he did not engage in any sexual activities with this prisoner. Fries steadfastly maintained that Mathie was a "wannabe snitch" who often wanted to speak with Fries about prison life, the progress of his criminal case, and his family.

Mathie was transferred out of the SCCF around August 1990. He filed the present section 1983 suit in January of the following year.[2] After a bench trial at which both Mathie and Fries testified, Judge Spatt credited Mathie's account of the events over Fries's and ruled that Mathie had met his burden of establishing that Fries sexually abused and sodomized him. Among other things, Judge Spatt relied on the following sources to support his finding of liability against Fries: (1) Mathie's detailed and credible testimony concerning the progression of Fries's sexual advances over a two-month period; (2) Mathie's detailed and credible testimony about the final incident of coerced sodomy; (3) SCCF log books indicating that Mathie visited Fries's office approximately seven times more often than any other inmate at the SCCF during the same period; (4) the duration of Mathie's visits, which lasted on average more than one hour, compared to a typical meeting between Fries and other inmates, which lasted only 25 minutes; (5) the timing of Mathie's visits—Mathie was often the last inmate seen by Fries during his work shift; (6) Fries's inability to explain satisfactorily why he met with Mathie so frequently, what occurred at these meetings, and why Mathie was accorded privileges

available only to reliable informants; (7) Mathie's knowledge of Fries's unlisted home phone number and address; (8) Fries's failure to inform prison officials and prosecutors that Mathie had confessed to Fries his participation in the charged homicide; and (9) the credible testimony of Mathie's mother and a prison social worker concerning the rapid and dramatic change in Mathie's behavior at the time of the alleged sexual abuse. *See Mathie,* 935 F.Supp. at 1298–99.

Based on the direct evidence in the form of Mathie's testimony, the available circumstantial evidence summarized above, and the numerous inconsistencies and gaps in Fries's version of what occurred between the two men, the District Court ruled that Mathie had established that he was repeatedly sexually abused by Fries and that Fries sodomized him while he was handcuffed to pipes in the second floor security office. The District Court further concluded that Fries's "malicious" acts caused Mathie physical and emotional injury, and awarded compensatory damages in the amount of $250,000 and punitive damages in the amount of $500,000.

## Discussion

### I. The Liability Finding

Fries contends that the District Court's finding that he had sexually abused and sodomized Mathie is clearly erroneous. He points out, for instance, that some aspects of Mathie's testimony are inconsistent, that Mathie, in a letter to his criminal attorney, initially denied that Fries had sexually abused him, and that a former SCCF inmate testified that Mathie discussed with him the possibility of framing Fries with false charges of sexual abuse.

"Following a bench trial, we may not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous," *Travellers International, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1574 (2d Cir.1994); *see* Fed. R.Civ.P. 52(a), *i.e.,* unless we are "left with the definite and firm conviction that a mis-

2. Mathie's complaint also alleged two state law claims: assault and battery, and intentional infliction of emotional distress. These claims were

dismissed by the District Court on state law grounds, *see Mathie,* 935 F.Supp. at 1301–02, and Mathie does not pursue them on this appeal.

take has been committed," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Moreover, although a "trial court's credibility determinations are not completely immune from appeal," *United States v. Rios*, 856 F.2d 493, 495 (2d Cir.1988), a reviewing court "owe[s] particularly strong deference where the district court premises its findings on credibility determinations," *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 64 (2d Cir.1992); *see Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("[If] a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

Although Fries highlights some points of vulnerability in Mathie's account, he has not persuaded us to overturn Judge Spatt's careful findings. We are not remotely left with a "definite and firm conviction that a mistake has been made." Judge Spatt assessed the probative value of the extensive evidence, some of which was contradictory, and carefully considered the demeanor and credibility of the two key witnesses, Mathie and Fries. Based on his assessment of Mathie's credibility and his consideration of the plethora of circumstantial evidence supporting the plaintiff's version of what occurred during the numerous meetings, Judge Spatt concluded that Fries sexually abused and sodomized Mathie at the SCCF in 1990. The factual findings on the issue of Fries's liability were not clearly erroneous.

**3.** These included (1) Mathie's testimony that he feared for his life during the sodomy incident, that he felt humiliated and embarrassed as a result of his encounters with Fries, and that he suffered and continues to suffer from "insecurity, fear, feelings of being vulnerable, panic attacks," anxiety, sleeplessness, nightmares, and distrust of other men; (2) Mathie's mother's testimony that, after his experience with Fries, her son became morose, depressed, difficult to talk to, and suffered from sleeplessness; (3) the testimony of Mary Filou, the senior psychiatric social worker at the SCCF, that Mathie became fearful,

## II. Compensatory Damages

The District Court awarded compensatory damages for two categories of injury—physical injury and emotional distress. *See Mathie*, 935 F.Supp. at 1304. As to the physical injury, the District Court relied on Mathie's testimony that he suffered pain and bleeding in his anal area for approximately one week following the coerced sodomy. As to the psychological injury, the Court relied on several sources to support its finding that the plaintiff has suffered intense and pervasive emotional distress as a result of Fries's actions.[3] Based on these sources, Judge Spatt concluded that Mathie sustained "a post-traumatic stress disorder, with accompanying symptomatology including depression, anxiety, fear, and disturbed sleep, to the present date." *Id.*

The District Judge acknowledged that "a part of the mental distress suffered by the plaintiff was caused by other factors," namely, the fact that Mathie had recently killed someone, was incarcerated for that crime, and was facing a prosecution and lengthy prison sentence for homicide. *Id.*

> The Court finds that a substantial part of the plaintiff's emotional problems, such as anxiety, depression and inability to sleep were a result of his participation in a brutal murder, his conviction for this crime, and the sentence he was serving as a result of that serious crime. In the determination of the monetary damages to be awarded to the plaintiff for the considerable emotional distress sustained as a result of the sexual abuse, the Court must be careful not to compensate the plaintiff for the non-related distress.

*Id.* After canvassing numerous state and federal court decisions discussing awards of

depressed, anxious, and generally manifested the symptoms of post-traumatic stress disorder after his encounters with Fries; (4) the testimony of Dr. Richard Dackow, a clinical psychologist working in the SCCF, that his "impression" was that Mathie's symptoms were consistent with a diagnosis of post-traumatic stress disorder; and (5) the report of Robert Dumond, a licensed mental health counselor and an expert in treating victims of sexual abuse, which concluded that the sexual assaults by Fries were the proximate cause of Mathie's post-traumatic stress disorder. *See Mathie*, 935 F.Supp. at 1302–04.

compensatory damages in somewhat comparable fact situations, the District Court awarded compensatory damages in the amount of $250,000. The Court carefully noted that "[i]ncluded in this determination is the finding that a part of the emotional distress suffered by the plaintiff was caused by his participation in a murder for which he is incarcerated and not [by] the violation of law in this case. . . ." *Id.* at 1306.

Fries challenges the compensatory damages award on three grounds. He contends that (1) the District Court's finding that Mathie has sustained and is currently suffering from post-traumatic stress disorder is clearly erroneous, (2) even if one assumes that he was responsible for *all* of Mathie's emotional suffering, the sum of $250,000 is excessive in relation to the injuries suffered, and (3) the sum of $250,000, when considered in light of the Court's finding that "a part" or "a substantial part" of Mathie's psychological injuries were not attributable to Fries's conduct, is unreasonably excessive. We discuss each argument in turn.

 (a) *The Court's factual findings.* The District Court's factual findings regarding the nature and source of Mathie's injuries are reviewed for clear error. *See, e.g., Blissett v. Coughlin,* 66 F.3d 531, 536 (2d Cir. 1995) ("We accord considerable deference to the factual findings of both judge and jury regarding damages."). The District Court credited the testimony of several witnesses and relied on the report of the plaintiff's expert, Robert Dumond,[4] in finding that Mathie is suffering from post-traumatic stress disorder—along with its accompanying symptoms, including anxiety, depression, and sleeplessness—at least partially as a result of Fries's sexual abuse and assault. Although the evidence in support of such a diagnosis is disputable, we are not convinced that a mistake has been made by the District Court. Importantly, we note that Fries's expert wit-

ness, Dr. Treacy, did not personally examine Mathie, failed to reach a contrary diagnosis regarding his condition, and concentrated her testimony on discrediting Dumond's report and deposition.

 (b) *Excessiveness of amount of compensatory damages.* Fries contends that $250,000 is excessive for Mathie's physical pain and psychological distress, even if all of Mathie's suffering is attributable to Fries's actions. It is well established in this Circuit that in section 1983 cases "[t]he standard for appellate review of damage awards, whether compensatory or punitive, 'is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir.1988) (quoting *Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir.1978)). Evaluating the District Court's award under this "narrow standard for review," *id.,* we conclude that $250,000 does not exceed what is reasonably necessary to compensate Mathie for his physical and emotional suffering.

As we have noted, the determination of whether a damages award exceeds a reasonable range "should not be made in a vacuum," *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir.1990), but should include consideration of the amounts awarded in other, comparable cases, *see, e.g., id.* at 186–87; *Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1058 (2d Cir. 1990); *Zarcone,* 572 F.2d at 54–55; *Hogan v. Franco,* 896 F.Supp. 1313, 1326 (N.D.N.Y. 1995). We consider compensatory awards in cases involving both sexual assaults by private individuals and assaultive and other misconduct by law enforcement officers.

*sexual assault by private individuals:*

— $1.75 million awarded to a plaintiff for defendant's sexual and aggravated assault over a two-day period. *Boorman v. Deutsch,* Index No. 29609/84 (Sup.Ct.N.Y.Co. Aug. 13,

---

**4.** We reject Fries's argument that Dumond's report could not be considered by the District Court for its truth. The record reveals that when Mathie first attempted to introduce this report into evidence, the Court sustained defense counsel's objection to its admission under the hearsay rule. Subsequently, however, during the testimony of the defense expert, Dr. Treacy, who focused her testimony almost exclusively on what was wrong with Dumond's report, defense counsel expressly consented to the report's admission so that Dr. Treacy's testimony could be made intelligible. Indeed, Dumond's report is marked as a *defense* exhibit in the record. Under such circumstances, the District Court properly considered the report in determining whether Mathie was suffering from post-traumatic stress disorder as a result of Fries's conduct.

1990) (unreported decision discussed in *Deborah S. v. Diorio,* 153 Misc.2d 708, 711, 583 N.Y.S.2d 872, 875–76 (Civ.Ct.N.Y. County 1992), *aff'd as modified,* 160 Misc.2d 210, 612 N.Y.S.2d 542 (Sup.Ct., App. Term 1st Dep't 1994)).

— $500,000 awarded to each of two infant plaintiffs raped and sexually abused by defendant who was engaged to their mother. *Phillips v. Goulbourne,* (unreported) *see* N.Y.L.J., Aug. 4, 1995, at 27 (Sup.Ct. Westchester County 1995).

— $400,000 awarded to a plaintiff who was raped twice at knife-point in her college dormitory. *Miller v. State,* 110 A.D.2d 627, 628, 487 N.Y.S.2d 115, 116 (2d Dep't 1985).

— $200,000 awarded to a plaintiff whom a police officer forced to perform oral sex. *Parrish v. Luckie,* 963 F.2d 201, 207 (8th Cir.1992).

— $100,000 awarded to a plaintiff whom a police officer raped in his home. *Parker v. Williams,* 855 F.2d 763, 775 & n. 11 (11th Cir.1988), *withdrawn and superceded on other grounds,* 862 F.2d 1471 (11th Cir.1989).

— $100,000, reduced from $200,000, awarded to a plaintiff sexually touched by her stepfather on several occasions when she was a child. *Laurie Marie M. v. Jeffrey T.M.,* 159 A.D.2d 52, 56–57, 559 N.Y.S.2d 336, 339–40 (2d Dep't 1990).

— $100,000 awarded to a plaintiff raped at knife-point by an acquaintance. *Deborah S.,* 153 Misc.2d at 715–16, 583 N.Y.S.2d at 878.

*assaultive and other misconduct by police officers:*

— $650,000 awarded to a plaintiff who was beaten by the defendant police officer, spent 60 hours in jail, sustained head trauma, displaced vertebrae, and cracked ribs, and suffered from considerable mental and emotional injury. *Ismail,* 899 F.2d at 186–87.

— $225,000 awarded to a police officer harassed by fellow officers. *Hughes v. Patrolmen's Benevolent Association,* 850 F.2d 876, 879, 884 (2d Cir.1988).

— $150,000, reduced from $300,000, awarded to a plaintiff whose injuries consisted essentially of a blow to the mouth that resulted in no permanent disability or disfigurement, 24 hours' confinement, the pendency of criminal charges for six months, and some "nightmares and occasional loss of sleep." *Bender v. City of New York,* 78 F.3d 787, 792 (2d Cir.1996).

— $100,000 to a plaintiff who was wrongly detained for approximately three hours and humiliated before his young child. *Bert v. Port Authority of New York and New Jersey,* 166 A.D.2d 351, 351, 561 N.Y.S.2d 416, 417 (1st Dep't 1990).

— $80,000 awarded to a plaintiff who was a victim of police use of excessive force, but who suffered no permanent physical disability. *O'Neill,* 839 F.2d at 13.

— $80,000 to a plaintiff who sustained no physical injuries but suffered severe emotional distress as a result of a police officer's verbal abuse and threats. *Zarcone,* 572 F.2d at 53.[5]

The District Court faced a difficult task in attempting to value the trauma suffered by Mathie as a result of Fries's conduct, both because the extent of emotional injury does not readily translate into dollar amounts and because few truly comparable cases can be found. Nonetheless, accepting as we do the District Court's finding that Mathie has suffered and continues to suffer from episodes of panic attacks, sleeplessness, insecurity, and anxiety as a result of Fries's sexual abuse and sodomy, and noting in addition the physical pain, humiliation, and fear that Mathie endured during and immediately following the final incident of forced sodomy, we do not think that the District Court's award of $250,000 is outside the range of reasonable compensation. The emotional distress of the sexual abuse inflicted in this case is inevitably aggravated by the fact that the acts were committed by a jailor upon an inmate in his custody.

**5.** *See also Gardner v. Federated Department Stores, Inc.,* 907 F.2d 1348, 1353 (2d Cir.1990) (awarding $150,000 to a plaintiff who was physi-cally assaulted and falsely imprisoned by security personnel of a department store).

(c) *Excessiveness arising from dual causation.* The District Court's task in quantifying Mathie's compensatory damages was complicated, as is ours in reviewing for excessiveness, by the fact that Mathie's emotional distress was caused by both Fries's sexual assault and Mathie's reaction to his own criminal conduct and his resulting incarceration. As the District Court found, "a part" or "a substantial part" of Mathie's psychological distress resulted from "his participation in a brutal murder, his conviction for this crime, and the sentence he was serving as a result of that serious crime," conditions for which Fries is obviously not responsible. *Mathie*, 935 F.Supp. at 1304.

Any approach the District Court might have taken to the allocation problem posed by the dual sources of Mathie's emotional distress would inevitably have involved considerable uncertainty. For example, the Court might have tried to determine the aggregate amount of Mathie's emotional distress and then estimated some allocable percentage attributable solely to the distress stemming from the sexual assault. Or the Court might have concluded that the distress unrelated to the sexual abuse was a preexisting condition and attempted to estimate the value of the incremental distress stemming from the assaultive conduct, assigning some value less than what would have been appropriate in the absence of the preexisting distress. Or the Court might have concluded that the preexisting distress made Mathie especially vulnerable to further distress, assigning an enhanced value to the distress stemming from the sexual abuse. None of these approaches would have avoided considerable guesswork. Indeed, the entire allocation problem, if susceptible to any precise resolution, appears to involve an analysis of psychological effects beyond what can reasonably be expected of a trial judge, who cannot be obliged to turn one lawsuit into a graduate seminar in forensic psychiatry.

Facing the inherent difficulty of the situation, Judge Spatt simply stated that his compensatory award "[i]ncluded" the finding that a part of the emotional distress suffered by the plaintiff was caused by circumstances for which he cannot recover. *Id.* at 1306. That candid recognition by an experienced and thoughtful judge that the duality of the causation was taken into account suffices to satisfy us as to the reasonableness of the compensatory award. *Cf. Roy v. Hartogs*, 85 Misc.2d 891, 893–94, 381 N.Y.S.2d 587, 589 (Sup.Ct., App.Term, 1st Dep't, 1976) (compensatory emotional distress award of $50,-000 reduced to $25,000 in view of long standing mental disorder that began years before episode for which suit was brought).

III. Punitive Damages

Punitive damages are available in a section 1983 case "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The District Court ruled that the "egregious, wanton and malicious nature of the acts committed by Fries warrant the award of punitive damages," *Mathie*, 935 F.Supp. at 1306, and assessed such damages in the amount of $500,000, *id.* at 1307. On appeal, Fries concedes that if his liability is upheld on appeal, his conduct would justify an award of punitive damages. He contends, however, that the punitive award is erroneous on two grounds: (1) the District Court improperly considered an indemnity agreement between Suffolk County and himself in setting the amount of punitive damages; and (2) the $500,000 sum is excessive. We consider each argument in turn.

(a) *Indemnity Agreement.* In the course of determining the amount of punitive damages, the District Court remarked: "As stated above, the County of Suffolk will indemnify the defendant as to compensatory and punitive damages. Accordingly, the Court need not analyze the impact of the award with regard to the defendant's personal finances." *Id.* at 1307. Fries reads this statement as indicating that the District Court "based" its punitive damages award on the indemnity agreement, and he contends that this was erroneous because the presence or absence of such an agreement cannot influence the determination of the proper amount of punitive damages.

■ We have previously refrained from considering "the extent to which an indemnification agreement is relevant to the amount of punitive damages that may properly be awarded." *Vasbinder v. Scott,* 976 F.2d 118, 122 n. 1 (2d Cir.1992). Although we do not decide the question of whether a fact-finder can rely upon the existence of an indemnity agreement in order to *increase* an award of punitive damages, we rule that a fact-finder can properly consider the existence of such an agreement as obviating the need to determine whether a defendant's limited financial resources justifies some *reduction* in the amount that would otherwise be awarded. It would be entirely inappropriate for a defendant to raise the issue of his limited financial resources if there existed an indemnity agreement placing the burden of paying the award on someone else's shoulders. *See Kemezy v. Peters,* 79 F.3d 33, 37 (7th Cir. 1996) ("The defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab.").

■ Moreover, in the pending case, Fries presented no evidence of his financial resources. Under well established precedent in this Circuit, "it is the defendant's burden to show that his financial circumstances warrant a limitation of the award." *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 373 (2d Cir.1988); *see Zarcone,* 572 F.2d at 56. The District Court had no evidence of a limited financial condition that might have held the amount of punitive damages to a modest sum. The Court mentioned the existence of the indemnity agreement only to underscore an additional reason for not adjusting the amount of the award to correlate with its impact on the defendant. Because the District Judge neither enhanced nor based the amount of punitive damages actually assessed upon the existence of the indemnity agreement, but merely determined the amount of the award without considering Fries's financial condition, no error occurred.[6]

**6.** We note that, even where an indemnity agreement covering punitive damages for intentional torts is not void as against public policy, the existence of such an agreement eliminates the

*(b) Excessiveness of Punitive Award.* Fries also contends that the $500,000 awarded to Mathie as punitive damages is excessive. The Supreme Court has recently identified three "guideposts" that bear on the reasonableness of punitive damages awards, at least the outer limits imposed by the Due Process Clause. *See BMW of North America, Inc. v. Gore,* —— U.S. ——, ——––——, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996). We have recently looked to these guideposts to "assist us in the application of our standard, by which we deem excessive a punitive damage award that 'shocks our judicial conscience,'" *Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir.1996) (quoting *Hughes,* 850 F.2d at 883). These guideposts are: "(1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 809. Though *Gore* initially described the third guidepost with reference to "civil" penalties, *Gore,* —— U.S. at ——, 116 S.Ct. at 1598, its discussion of this guidepost makes clear that the relevant comparison is with both "civil and criminal penalties," *id.* at ——, 116 S.Ct. at 1603.

The punitive award against Fries satisfies the three *Gore* factors. Fries's sexual abuse of an inmate in his custody was reprehensible in the extreme and involved violence and malice, the two-to-one ratio between the punitive and compensatory awards is not unreasonable, and the civil and criminal penalties potentially applicable to Fries's conduct are not more lenient than the $500,000 punitive damages award. *See* N.Y. Penal L. § 130.50 (McKinney 1987) (first degree sodomy is Class B felony, punishable by maximum penalty of 25 years).

■ This does not end our inquiry, however, since, as we noted in *Lee,* even where the punitive award is not beyond the outer constitutional limit marked out, however imprecisely, by the three *Gore* guideposts, we retain an appellate responsibility to re-

effect of such damages serving as punishment for a tort-feasor; only the effect of deterring others remains.

view punitive awards for excessiveness in applying federal statutes such as section 1983. *Lee*, 101 F.3d at 811–12. That task requires comparison with awards approved in similar cases, *see, e.g.*, *Ismail*, 899 F.2d at 186–87; *O'Neill*, 839 F.2d at 13–14, to determine, as with compensatory awards, whether the punitive award is "so high as to shock the judicial conscience and constitute a denial of justice." *Zarcone*, 572 F.2d at 56. In making that comparison, we bear in mind that the purpose of punitive awards is to punish the wrongdoer and to deter others. *See Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991); *Vasbinder*, 976 F.2d at 121. We consider punitive awards in cases involving both sexual assaults by private individuals and assaultive and other misconduct by law enforcement officers.

*sexual assaults by private individuals:*

— $500,000 awarded to each of two plaintiffs, aged seven and ten, who were repeatedly raped, sodomized, and otherwise sexually abused. *Phillips, supra* (unreported), *see* N.Y.L.J., Aug. 4, 1995, at 27.

— $200,000 awarded to a plaintiff who was raped at knife-point by an acquaintance who also slashed her face and clothes. *Deborah S.*, 153 Misc.2d at 716, 583 N.Y.S.2d at 879.

— $100,000, reduced from $275,000, awarded to a plaintiff who was sexually touched as a child by her stepfather. *Laurie Marie M.*, 159 A.D.2d at 59–61, 559 N.Y.S.2d at 341–42.

*misconduct by law enforcement officers:*

— $500,000, reduced from $1,250,000, awarded to each plaintiff whom police officers shot at, assaulted, denied medical care, and maliciously prosecuted. *Papa v. City of New York*, 194 A.D.2d 527, 531–33, 598 N.Y.S.2d 558, 562–63 (2d Dep't 1993).

— $350,000 to a plaintiff who was the victim of police harassment. *Hughes*, 850 F.2d at 883.

— $185,000 awarded to a plaintiff who was beaten by police officers while handcuffed. *O'Neill*, 839 F.2d at 13.

— $150,000 to a plaintiff who was severely beaten by a police officer, placed in jail for 60 hours, and wrongly charged with several offenses. *Ismail*, 899 F.2d at 185, 187.

— $150,000, reduced from $250,000, to a plaintiff held in pre-trial detention for two months at Rikers Island as a result of a malicious prosecution. *King v. Macri*, 993 F.2d 294, 299 (2d Cir.1993).

— $75,000, reduced from $200,000, to a plaintiff who was a victim of a police assault and a malicious prosecution. *Lee*, 101 F.3d at 812–13.

Fries's conduct was, as Judge Spatt properly characterized it, "an outrageous abuse of power and authority." *Mathie*, 935 F.Supp. at 1306–07. A substantial punitive award was clearly merited. We can well understand the sense of outrage that prompted an experienced and conscientious district judge, after hearing the evidence of this shocking sequence of events, to award $500,000 as both a punishment for Fries and a deterrent to others. Nevertheless, the appellate function must be exercised, and review of punitive awards for excessiveness is an especially appropriate context in which the reflective role of a court of appeals follows the often dramatic arena of a trial court. The Supreme Court's guideposts in *Gore*, though marking outer constitutional limits, counsel restraint with respect to the size of punitive awards even as to the nonconstitutional standard of excessiveness. We have anticipated and heeded that caution in recent decisions applying section 1983. *See Lee*, 101 F.3d at 812–13 (reducing $200,000 punitive award to $75,000); *King*, 993 F.2d at 299 (reducing $250,000 punitive award to $150,000).

Bearing in mind both the outrageousness of Fries's conduct and our own appellate responsibilities, we conclude that the punitive damages award in this case may not exceed $200,000.

## IV. Official Capacity

The District Court awarded damages against Fries both "individually and in *his former official capacity* as Sergeant of Security in the Suffolk County Correctional

**818**

[F]acility." *Mathie,* 935 F.Supp. at 1307 (emphasis added). This was error.

A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer, here Suffolk County. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985). A claim against a person "in his former official capacity" has no meaning. If the claimant seeks to hold the offender personally responsible, the claim is against the person in his individual capacity. A claim against an offender in his official capacity is, and should be treated as, a claim against the entity that employs the officer, here Suffolk County. *See id.* Mathie does not purport to be making a claim against Suffolk County, a claim that would require proof of a governmental entity's custom or policy. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (municipal liability).

On remand, the judgment should be modified to remove the reference to liability against Fries in his "former official capacity."

### Conclusion

We reject Fries's remaining arguments without discussion. We affirm the District Court's finding that Fries sexually abused and sodomized Mathie, affirm the award of $250,000 in compensatory damages, reduce the award of punitive damages to $200,000, and remand for entry of a revised judgment consistent with this opinion.